# IN THE COURT OF APPEALS OF IOWA

No. 21-1810
Filed February 16, 2022

**IN THE INTEREST OF B.W., Z.W., T.W., and W.W.,**
**Minor Children,**

**B.W., Father,**
     Appellant,

**C.W., Mother,**
     Appellant.

_____

Appeal from the Iowa District Court for Linn County, Carrie Bryner, District

Associate Judge.


A father and a mother appeal the termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**


Kylie Liu of the Office of the State Public Defender, Cedar Rapids, for

appellant father.

Morgan Wilson of Iowa Legal Aid, Cedar Rapids, for appellant mother.

Thomas J. Miller, Attorney General, and Tabitha J. Gardner, Assistant

Attorney General, for appellee State.

Robin Licht, Cedar Rapids, attorney and guardian ad litem for minor

children.


Considered by Tabor, P.J., and Greer and Ahlers, JJ.

**TABOR, Presiding Judge.**

A mother, Crystal, and a father, Bruce, each appeal the termination of their parental rights to four sons: fifteen-year-old B.W., twelve-year-old Z.W., nine-year-old T.W., and six-year-old W.W. In her petition on appeal, Crystal argues termination is not in the children's best interests and asks for a guardianship instead. In his petition, Bruce contends the Iowa Department of Human Services (DHS) didn't make reasonable efforts toward reunification when it failed to address his transportation concerns. Finding the parents' claims do not merit reversal, we affirm the juvenile court's termination order.[1]

## I. Facts and Prior Proceedings

These proceedings began in January 2020, when police arrested Bruce for possessing methamphetamine.[2] Soon after, the juvenile court determined the children were in need of assistance (CINA). For a few months, the children and Crystal moved in with Crystal's mother. But after Crystal admitted methamphetamine use, the court removed the children from parental custody and

---

[1] Termination reviews are de novo. *In re M.D.*, 921 N.W.2d 229, 232 (Iowa 2018). Although we give weight to the juvenile court's fact findings, they do not bind us. *Id.* Our review follows a three-step process. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010); *see* Iowa Code § 232.116 (2021). First, we look for a termination ground. Iowa Code § 232.116(1). Then we consider the children's best interests. *Id.* § 232.116(2). And, finally, we examine factors weighing against termination. *Id.* § 232.116(3). Because Bruce and Crystal contest different stages of the process, we examine each appeal separately. *See In re J.P.*, No. 19-1633, 2020 WL 110425, at *1 (Iowa Ct. App. Jan. 9, 2020) ("[I]f a parent does not challenge a step in our analysis, we need not address it.").

[2] The DHS performed a child abuse assessment in 2016 for allegations of physical abuse by Bruce, but it was not confirmed. The DHS performed another assessment in 2019 based on a report that the parents were using methamphetamine while caring for the children. It was also not confirmed.

placed them with their maternal aunt and her husband. They have remained in that home since May 2020.

For the next year and a half, the DHS offered the parents a plethora of services aimed at reunification. But they failed to fully engage. Bruce twice enrolled in out-patient treatment programs for his substance abuse, but was discharged both times for nonattendance. And, as of the termination hearing, he was not engaged in any treatment, substance abuse or otherwise.

Crystal followed a similar path. Like Bruce, she enrolled in two out-patient treatment programs. She also participated in group therapy. But, again like Bruce, her nonattendance stalled progress. After being discharged from the second out-patient program, she was referred to a detox and residential treatment center. But she never followed through on that referral. The juvenile court believed Crystal's attendance issues were an attempt to "shop" for the least restrictive treatment plan.

Given their non-engagement with treatment, neither parent made significant strides toward battling their methamphetamine addictions. Adding to their lack of progress, both parents missed most of their drug testing appointments—Bruce completed about forty percent of offered tests, faring slightly better than Crystal's thirty-three percent. And of the tests actually taken, Crystal only had two come back negative, edging out Bruce's one. Positive and missing tests aside, both admitted to abusing methamphetamine during the CINA proceedings.

Bruce also had a few run-ins with the law. After an operating-while-intoxicated conviction, his driver's license was barred. Despite that bar, he drove illegally, attracting police attention. And, in January 2021, he served two days in

jail for a probation violation. Bruce blamed his barred license for his difficulties in finding employment, accessing treatment services, and reporting to drug testing.

On a positive note, both parents had more success with attendance at visitations. At first the interactions were at the grandmother's house. But the service provider grew concerned that the boys were overly rambunctious there, recalling T.W. once ran around with a hand saw, one of the tools that the boys referred to as "weaponry." In the interests of safety, the provider moved the visits to the Family First Services (FFS) office. To an extent, the change of scenery helped. But the parents continued to have trouble supervising the children and redirecting their energies. That said, the parents regularly attended the twice-weekly two-hour visits, though Bruce was often late, according to the provider. But on balance the parents' progress never warranted unsupervised visits, and no trial home placements ever happened.

Believing reunification was unachievable in the foreseeable future, the State petitioned for termination in May 2021. The juvenile court held a trial in August and terminated the parental rights in November. The parents separately appeal.

## II. Analysis

### A. Bruce's Appeal

### 1. Jurisdiction

At the start, we must decide if we have jurisdiction to consider Bruce's challenge. Under our rules of appellate procedure, a notice of appeal in a termination case "must be filed within 15 days after the filing of the order or judgment." Iowa R. App. P. 6.101(1)(a). In the next step of this expedited process,

a petition on appeal must be filed "within 15 days after filing the notice of appeal." Iowa R. App. P. 6.201(1)(b).

The juvenile court filed its termination order on November 8. But Bruce's attorney did not file a notice of appeal until November 26—eighteen days later. Noting the apparent untimeliness, our supreme court ordered an explanation for the late filing. In that jurisdictional statement, the father's counsel insisted Bruce's appeal was timely, arguing the "computing time" under Iowa Code section 4.1(34) ran from November 9 because the statute states: "the first day shall be excluded and the last day included." Counsel then calculated November 24, as the deadline and noted that day had been added as a state holiday in 2021. We need not address the holiday issue because counsel misread the statute. Excluding the first day means starting the count from the date of the order, not the day after it. *See, e.g.*, *Zick v. Haugh*, 165 N.W.2d 836, 837 (Iowa 1969) (holding June 14 is not within thirty days from the entry of the judgment on May 14). The notice of appeal was due November 23. Bruce's notice was three days late.

In the alternative, Bruce seeks a delayed appeal. *See In re W.M.*, 957 N.W.2d 305, 316 (Iowa 2021) (allowing delayed appeal when parent clearly intended to appeal and delay in filing notice was "no more than negligible"); *see also In re A.B.*, 957 N.W.2d 280, 293 (Iowa 2021) (applying same standard to petition on appeal). His attorney argues that Bruce showed his intent to appeal by signing the notice and any failure to timely perfect the appeal was counsel's

mistake. He also argues any delay was "negligible" and "will have no impact on timing throughout the life of this appeal."

In its response, the State argues both Bruce's notice of appeal and his petition on appeal were untimely. The State also cites a case from our court holding that the parent must show "some extenuating circumstance" for the delay. *See In re C.R.*, No. 21-0630, 2021 WL 4303584, at *1 (Iowa Ct. App. Sept. 22, 2021) *abrogated by In re W.T.*, 967 N.W.2d 315 (Iowa 2021). But our supreme court has since clarified that "extenuating circumstances" are not required. *W.T.*, 967 N.W.2d at 322. A delayed appeal is allowed if counsel can show (1) the parent clearly intended to appeal; (2) failure to timely perfect the appeal was outside of the parent's control; and (3) the delay was "no more than negligible." *Id.*

So we are left with the question whether a three-day delay counts as "no more than negligible." *See id.* at 326 (Waterman, J., dissenting) (contemplating future litigation to figure out where to draw the line in cases without extenuating circumstances). In the three delayed appeals granted by our supreme court, the measure of negligible was a day or two. *See, e.g.*, *id.* at 318 (one day); *A.B.*, 957 N.W.2d at 293 (two days); *W.M.*, 957 N.W.2d at 316–17 (two days). In an unpublished case, our court found a delay of three days was "'no more than negligible' and did not delay the appeal process." *In re C.B.*, No. 21-0814, 2021 WL 4303660, at *3 (Iowa Ct. App. Sept. 22, 2021). Given the expedited nature of child-welfare appeals, three days may be pushing the limit of what can be

considered negligible.[3]  But we opt to follow the course we took in *C.B.* and grant the delayed appeal.

### 2.    Reasonable Efforts

The juvenile court terminated parental rights under section 232.116, paragraph (f).  Under that paragraph, a court may terminate rights if:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Iowa Code § 232.116(1)(f).

Bruce does not directly contest the grounds for termination.  Instead, he asserts that the DHS did not make reasonable efforts toward reunification.  *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("[T]he reasonable efforts requirement is not viewed as a strict substantive requirement of termination.  Instead, [it] . . . impacts the burden of proving the elements of termination which require reunification efforts.").

He argues that a lack of transportation proved his undoing.  He believes that "but for [his] transportation issues, he would have been able to take advantage of substance abuse treatment, which he may have successfully completed, and subsequently show his progress and success through consistent drug testing."

---

[3] In common parlance, "negligible" means "not significant or important enough to be worth considering, trifling."  *Negligible*, American Heritage Dictionary (2d Coll. ed. 1982).

When weighing reasonable efforts, a parent's request for more assistance is key. *See In re L.M.*, 904 N.W.2d 835, 839–40 (Iowa 2017) ("[P]arents have a responsibility to object when they claim the nature or extent of services is inadequate."); *In re O.T.*, No. 18-0837, 2018 WL 3302167, at *2 (Iowa Ct. App. July 5, 2018) ("The failure to request different or additional . . . services in the juvenile court precludes [the parent's] challenge to the services on appeal."). So first, did Bruce request additional services?

Bruce broached the transportation issue in March 2020 during a FFS meeting. In that interaction, the father contended his driving restriction contributed to his inability to hold down a job. About a year later, he tied the transportation concerns to drug testing and substance abuse treatment. In February 2021, he "reported at court that [his transportation] issues were barrier to drug testing, detox and other substance abuse treatments." And in March, June, and July FFS meetings, he reiterated this concern, noting that not having a ride was an obstacle to testing.

Beyond informing the DHS, he made his concerns known to the court. In a February order, the court found that "the Department of Human Services has made reasonable efforts . . . . Further, no party has requested additional services or assistance, *except for the parents' request for assistance with transportation.*" (Emphasis added.) Given that order, we're satisfied that Bruce asked for help with transportation.

In response to Bruce's reasonable-efforts argument, the State argues that his transportation struggles were overblown or disingenuous. In support of this position, it points to Crystal's willingness to drive him. But we don't think her

generosity negates Bruce's barrier.  And this family's case plan was demanding, requiring each parent to attend (1) twice weekly visitations, (2) regular drug testing, and (3) intensive out-patient substance-abuse treatments.  It wasn't feasible for Crystal to keep up with Bruce's schedule on top of her own.

Equally unpersuasive, the State highlights several driving-while-barred charges as proof that Bruce's transportation concerns were selective.  True, the charges reflect his willingness to ignore the driving prohibition.  But we won't fault Bruce for not breaking the law more consistently.

The State also asserts that he "was given options for transportation that he chose not to utilize."  It relies on a July 2021 FFS report which read: "Bruce stated to the [FFS] worker that he has not been testing consistently at all due to not having a ride to be tested.  The [FFS] worker provided Bruce a few recommendations for rides but he did not seem very interested with any of the options."  But this excerpt doesn't explain what those options were.  And the State did not flesh out possible accommodations at the termination hearing.  Under cross examination, the case worker acknowledged that the DHS had not pursued other transportation options.

> Q. At many of the meetings transportation issues have been discussed and there is no available bus to help with that.  Were any other solutions or anything like that discussed as a way to help [the father] either have to choose between driving himself and not following the case plan?  A. At the Foster Care Review Board, I believe Horizons was recommended like that we try and see if that was an option.
> Q. And did you?  A. I did not.

On this record, we cannot find that Bruce failed to fully avail himself of transportation services offered by the DHS.  *Cf. In re A.C.*, No. 20-0964, 2020 WL 7021569, at *2 (Iowa Ct. App. Nov. 30, 2020) ("Workers provided rides to the father

for visitations, appointments, and drug testing. And DHS provided the father with gas cards at times.").

But all that said, the reasonable efforts requirement does not mean the State must "search for unavailable services." *In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002). While Bruce used his lack of transportation as an excuse for failing to comply with drug-testing and treatment, he did not identify what services would have helped him fulfill the case plan. *See In re L.M.W.*, 518 N.W.2d 804, 807 (Iowa Ct. App. 1994) (discussing parents' responsibility to request "specific services"). For example, he did not ask for financial assistance with public transportation. Nor did he suggest drug-testing or treatment venues more accessible from his residence. *See In re A.J.*, No. 21-0509, 2021 WL 3076304, at *3 (Iowa Ct. App. July 21, 2021) (rejecting reasonable-efforts claim when father with unreliable transportation "did not request any other actions to facilitate his drug testing"). And to a large extent, Bruce's transportation woes were self-inflicted, as his criminal actions led to the driving bar. *See id.* at *2.

Finally, we question Bruce's speculation that "but for" his transportation issues he may have successfully completed substance abuse treatment and shown success in drug testing. Early in the CINA case, Bruce completed a substance-abuse evaluation, but disagreed with its recommendation for intensive outpatient treatment. As the juvenile court observed, "Bruce has failed to acknowledge the severity of his substance abuse and has not taken his treatment seriously." The record shows Bruce's denial of the need for substance-abuse services, and not the difficulty in accessing those services, has been the biggest obstacle to becoming a safe parent.

Under these circumstances, we find the State offered clear and convincing evidence to support termination, including proof that it made reasonable efforts to ensure that the children could be safely returned to Bruce's care. *See C.B.*, 611 N.W.2d at 493. So we affirm the termination of his parental rights.

### B. Crystal's Appeal

Crystal concedes the ground for termination. Instead, she takes aim at the second step, arguing termination was not in the children's best interests. In support, she points to her close bond with her sons and their "behavioral issues" that have manifested in their current placement.[4] In the alternative, she asserts that guardianship, rather than termination, is the more appropriate course of action.

Statutory factors guide the best-interests analysis. We give primary consideration to the children's safety, to the best placement for furthering their long-term nurturing and growth, and to their physical, mental, and emotional condition and needs. Iowa Code § 232.116(2).

These principles in mind, we believe termination is in the children's best interests. True, Crystal and the boys have a genuine, close connection. Through these proceedings, she's remained dedicated to her children. She has seldom missed a visitation, bringing snacks and activities to twice-weekly sessions. And we don't discount these efforts.

---

[4] Although framed as a best-interests argument, Crystal's reference to the close bond with her children implicates section 232.116(3)(c). But that exception is permissive, not mandatory; its application is within the court's discretion. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014). And the close-bond exception requires Crystal to offer clear and convincing evidence that termination would be detrimental to the children. *See W.M.*, 957 N.W.2d at 315. That evidence is missing here.

On the other hand, her commitment to her treatment, both substance abuse and mental health, is not there. Unlike the visitations, she's missed about two-thirds of her drug tests and has been discharged from professional treatment services for lack of attendance. Because she continues to battle her methamphetamine demons, we find that she is not in a place to tend to her children's immediate or long-term needs. *See* Iowa Code § 232.116(2) (giving "primary consideration to the children's safety"); *In re W.S.*, No. 21-0264, 2021 WL 2453046, at *2 (Iowa Ct. App. June 16, 2021) ("The parents' continued methamphetamine use creates a safety risk . . . .").

And others agree. First, the children are aware of their mother's situation and are happy in their placement. B.W., the oldest, "knows he can't go home because his parents aren't doing what they need to do" and "knows his parents are using." And the younger boys have asked to live with their aunt "forever." Second, the children's grandmother testified that Crystal wasn't in a position to care for them. Third, Crystal agreed, acknowledging that she was not ready to take the children back and conceding that their current placement is a good one. True, the children have had "behavioral issues" as of late, including running away, misbehavior at school, and an uptick in mental-health needs. But the record suggests these issues relate to a change at their current placement, their aunt having recently divorced her husband. Adding to that disruption by separating the boys from their aunt would likely worsen their behaviors.

Next, Crystal argues that guardianship—not termination—was the better option. She notes that while the children are in their aunt's custody, the juvenile court can supervise Crystal's progress. But "a guardianship is not a legally

preferable alternative to termination." *See W.M.*, 957 N.W.2d at 315. And a guardianship, unlike termination, doesn't promote stability and permanency. *See In re S.R.*, No. 20-0210, 2020 WL 2065953, at *1 (Iowa Ct. App. Apr. 29, 2020). Given Crystal's lack of progress toward reunification over the last year and a half, we believe termination of her parental rights better serves the children's need for a stable, permanent home.

**AFFIRMED ON BOTH APPEALS.**

Greer, J., concurs; Ahlers, J., concurs specially.

**AHLERS, Judge** (specially concurring).

I agree with the entire majority opinion, with one exception relating to the jurisdictional issue surrounding the father's request for a delayed appeal. On that issue, I agree with the outcome reached by the majority, but for a different reason.

As the majority points out, the three requirements for allowing a delayed appeal are: (1) the parent clearly intended to appeal; (2) failure to timely perfect the appeal was outside the parent's control; and (3) the delay was "no more than negligible." *In re W.T.*, 967 N.W.2d 315, 322 (Iowa 2021). Like the majority, I find the father met the first two requirements and his notice of appeal was filed three days late. So the dispositive question on this issue is whether this delay was no more than negligible.

As I read its opinion, the majority concludes that a three-day delay is no more than negligible. With this as a general point, I disagree. The expedited appeal deadline in these types of cases is fifteen days. Iowa R. App. P. 6.101(1)(a). The deadline is expedited for a reason—"to bring the termination of parental rights proceeding to a more timely resolution" and "reduc[e] the time all must wait in litigation limbo until their case is finally resolved." *In re R.K.*, 649 N.W.2d 18, 21 (Iowa Ct. App. 2002). Allowing three extra days extends the fifteen-day deadline by twenty percent. Keeping in mind that negligible means "so small or unimportant or of so little consequence as to warrant little or no attention" or "trifling,"[5] I cannot conclude a twenty percent extension of the appeal deadline is "no more than negligible." No other scenario comes to mind in which the mark can

---

[5] *Negligible*, Merriam-Webster, https://www.merriam-webster.com/dictionary/negligible (last visited February 11, 2022).

be missed by twenty percent and one would conclude the miss was no more than negligible. To the extent the majority holds that a three-day delay in general meets the "no more than negligible" requirement, I respectfully disagree.

So, why is this a special concurrence rather than a dissent? Because the unique circumstances here make the delay negligible. The father's appeal deadline was Tuesday, November 23, 2021. The father filed his notice of appeal on Friday, November 26. In my view, in an ordinary week, this would be more than a negligible delay and would be too late. But the week in question was Thanksgiving week, and a special Thanksgiving week to boot. In a normal Thanksgiving week, Thursday and Friday are holidays on which the judicial branch's clerk's offices are closed. In 2021, Governor Kim Reynolds declared a special additional holiday on Wednesday, November 24. So, in 2021, the clerk's offices closed at the end of the business day on Tuesday, November 23, and did not reopen until Monday, November 29. If the father had filed his notice of appeal after business hours but before midnight on November 23, it would have been timely. *See* Iowa Ct. R. 16.309(1)(c) ("A document is timely filed if it is filed before midnight on the date the filing is due."). Given that the clerk's office was not open to process the father's filing starting when the office closed on November 23 and ending when it reopened on November 29, it made no practical difference whether it was timely filed on November 23 after the clerk's office closed or was untimely filed any time thereafter until the clerk's office reopened on November 29. Only because the father's filing was made during this window of time can I conclude that the three-day delay here was of so little consequence that it was no more than negligible.

I join in the majority opinion, with the exception noted relating to the reason to allow the father's delayed appeal.